IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | | |
| Plaintiff, | | No. CR13-2039 |
| vs. | | REPORT AND RECOMMENDATION |
| BENJAMIN CONRAD, | | |
| Defendant. | | |

TABLE OF CONTENTS

I.    INTRODUCTION ........................................ 2

II.   PROCEDURAL HISTORY ................................ 2

III.  RELEVANT FACTS ..................................... 2
      A.   Package Delivery ............................... 2
      B.   Discussion Outside the House ................... 5
      C.   Discussion Inside the House .................... 6

IV.   DISCUSSION ......................................... 9
      A.   Was the Search of Defendant's Residence Unlawful? ......... 10
           1.   Did Defendant Give Consent to Search? .............. 10
           2.   Was Defendant's Consent Voluntary? ................ 10
      B.   Was the Search of the Packages Unlawful? ............... 14
      C.   Was Defendant Improperly Interrogated After Asking for
           Counsel? ...................................... 16
           1.   Was Defendant in Custody While Being Questioned? ...... 17
           2.   Did Defendant Unambiguously Ask for Counsel Before
                Questioning Could Continue? ..................... 19

V.    RECOMMENDATION ................................... 21

## I. INTRODUCTION

On the 4th day of February 2014, this matter came on for hearing on the Motion to Suppress: Search of Home/Property (docket number 12), filed by the Defendant on January 16, 2014, and the Motion to Suppress: Statements to Police (docket number 13), filed by the Defendant on January 17. The Government was represented by Special Assistant United States Attorney Lisa C. Williams. Defendant Benjamin Conrad appeared in person and was represented by his attorney, Mark R. Brown.

## II. PROCEDURAL HISTORY

On December 18, 2013, Defendant Benjamin Conrad was charged by Indictment with conspiracy to import pseudoephedrine (Count 1) and possession of pseudoephedrine to manufacture methamphetamine (Count 2). Defendant appeared on December 23 and entered a plea of not guilty. Trial was scheduled before Chief Judge Linda R. Reade on February 24, 2014.

On January 16 and 17, 2014, Defendant timely filed the instant motions to suppress. The Government filed its resistance on January 27, 2014. Because of the pending motions to suppress, the trial was continued to April 7, 2014.

## III. RELEVANT FACTS

### A. Package Delivery

In July 2011, the postmaster in Winthrop, Iowa, called United States Postal Inspector Kevin Marshall to report suspicious packages.[1] The postmaster advised Marshall that during the preceding several months, more than 25 packages had been sent from Canada to Defendant Benjamin Conrad. Several of the packages had broken open during transit and the postmaster could see that they contained pills or some type of medication. Marshall, who is assigned to the "dangerous mail investigations team," testified that

---

[1] According to Inspector Marshall, postal employees are trained to notify the postal inspection service of suspicious activity.

Canada is known as a source country for the purchase of pseudoephedrine to be used in the manufacture of methamphetamine.[2]

On July 22, 2011, Inspector Marshall called Special Agent John "Jake" Austin of the Iowa Division of Narcotics Enforcement to inform him of the suspicious activity. Austin followed up by contacting the Independence Police Department (located near Winthrop) and the Buchanan County Sheriff's Office. In addition, Austin searched a database containing "pseudo logs," which are records maintained by retailers on the sale of pseudoephedrine. Austin testified that Defendant purchased pseudoephedrine once or twice per month for the past 12 months.

On July 25, 2011, the Winthrop Postmaster contacted Inspector Marshall again, and reported the arrival of three packages. All three packages were from Joe Dam in Montreal, Canada, and were addressed to Ben Conrad at a rural address in Winthrop, Iowa. The mailing labels on the packages indicated they were "health and beauty." One of the packages had been ripped during transit and it appeared to contain pills. Marshall contacted Agent Austin and they agreed to meet in Winthrop on the following day.

On July 26, 2011, Inspector Marshall met with Agent Austin at the Winthrop post office, where Marshall took possession of the three packages. Both Marshall and Austin testified that they could tell there were boxes of pills in the packages. According to Marshall, he could hear the pills "shake," and he could see boxes in the package containing the tear, although he could not tell the nature of the boxes or see any brand

---

[2] Iowa, like many states, monitors the sale of cold pills containing pseudoephedrine. The sale of pseudoephedrine is not regulated in Canada and, according to Inspector Marshall, cold pills containing pseudoephedrine are routinely purchased from Canada and delivered through the mail. Marshall opined that there was no legitimate reason for individuals to purchase cold pills containing pseudoephedrine from Canada. (Marshall also opined that if the cold pills did *not* contain pseudoephedrine, then there was similarly no reason to purchase them from Canada, since they could be readily purchased locally.)

name. Marshall testified that he did not search, open, or manipulate the packages in any way.

When Inspector Marshall arrived at the post office on July 26, he was informed that a fourth package had arrived that morning. The fourth package was almost identical to the other three packages in appearance. It contained the same hand-written mailing label from the same sender in Montreal, Canada. However, the fourth package was addressed to Keating's Collectibles in Winthrop.[3]

It was decided that Inspector Marshall would conduct a "controlled delivery" of the original three packages to Defendant's rural residence. Agent Josh Mulnix of the Iowa Division of Narcotics Enforcement accompanied Marshall for officer safety. Agent Austin and other local law enforcement officers provided surveillance and additional security. Marshall dressed as a postal carrier and proceeded to Defendant's residence. Defendant was not home, however, when Marshall initially attempted delivery of the packages in the morning. Accordingly, the officers decided to leave the property and maintain surveillance.

At approximately 2:30 p.m., officers observed Defendant arrive back at the residence. Another individual driving a separate vehicle also arrived at that time. After approximately ten minutes, the second person left the premises, and it was decided that Inspector Marshall would complete the delivery. Marshall approached the side door at Defendant's residence, knocked on the door, and Defendant came outside. Marshall identified himself as a postal employee and told Defendant that he had three packages for him. Defendant accepted delivery of the three packages, but when Marshall asked him to

---

[3] When Agent Austin asked local law enforcement authorities if they were familiar with Defendant, they reported that they did not know him to have a criminal record or being arrested previously, but they knew he was an associate of Shawn Keating, who was suspected of being involved in the manufacture of methamphetamine. (Austin later determined that Defendant has been convicted of drunk driving.)

sign for the packages, Defendant was "hesitant to sign any type of paperwork for the packages." Defendant ultimately did not sign the notice of delivery.

At that point, Agent Austin arrived, together with other agents and officers. According to Austin, there were eight officers present. One officer was in uniform, with the remaining officers in plain clothes. Agent Austin was the "case agent" and took charge at the scene. Austin and Darwin Meyer, assistant police chief in Independence, approached Defendant to talk about the investigation and seek permission to search Defendant's property. At that point, Inspector Marshall "stepped back" and assumed a secondary role.

## B. Discussion Outside the House

Agent Austin identified himself as an agent with the Division of Narcotics Enforcement, and showed Defendant his credentials. Austin asked Defendant whether there was "anything dangerous in the house or weapons in the house that could hurt us," and Defendant stated that he had a handgun in the house. Austin then conducted a "protective sweep" of the residence. According to Austin, he only looked in those places "where a person could hide." Austin denied that he conducted any "search" of the residence at that time, although he observed two handguns on the kitchen table and a jar containing what he believed to be marijuana on a coffee table in the living room in plain view. Austin then returned to the yard to speak with Defendant further.

Agent Austin introduced himself again, and introduced Assistant Chief Meyer, although it seemed to Austin that Defendant knew Meyer, or knew of him. Austin, Meyer, and Inspector Marshall all testified that the discussion in the yard was "conversational." That is, Austin was "calm and collected" and did not raise his voice at any time. Austin testified that Defendant was coherent, appeared to understand Austin's

statements, and responded appropriately.[4]  Defendant had a lot of questions about the investigation, whether he was in trouble, what he could be charged with, whether he would be responsible for actions taken by others on his property to manufacture methamphetamine, and whether he was going to jail.  Austin repeatedly assured Defendant that he was not under arrest and that he had "no intentions of taking him to jail."

While speaking with Defendant in the yard, Agent Austin asked repeatedly for permission to search the property.  During this time, Defendant walked around the property and smoked a cigarette.  According to Austin, he told Defendant that he had the "option" of not talking to him.  Austin testified that "I told him that the ball was in his court and he had to make a decision one way or another if he wanted to cooperate with law enforcement and talk to us, or if he would rather us leave and get a search warrant, and that was totally up to him."  Austin and Inspector Marshall testified they previously agreed that if Defendant did not consent to a search, then they would seek a search warrant.  After approximately 40 minutes, Defendant agreed to a search of his property.  Defendant and the officers then entered the residence.[5]

### C. Discussion Inside the House

As other officers were searching the property, Agent Austin and Assistant Chief Meyer questioned Defendant.  The discussion with Defendant took place primarily at the kitchen table.  Meyer recorded the conversation.[6]  Early in the discussion, Austin asked

---

[4] Later, while Agent Austin and Defendant were speaking inside the house, Defendant said that he had used methamphetamine the day before.

[5] According to Agent Austin, the total elapsed time from when Inspector Marshall approached the house to deliver the packages until officers entered the house to conduct a consent search was approximately 50 minutes.

[6] The recording was introduced as Exhibit 2 at the hearing.  For reasons which are not entirely clear, the first five minutes of the conversation was recorded, followed by
(continued...)

Defendant for permission to open the three packages delivered that day. I have attempted
to prepare a transcript of that portion of the recorded conversation:

> AGENT: Okay, let's get this out of the way, too. You don't mind if we open those packages up and look at what's inside them right? That's okay?

> DEFENDANT: *I don't give a fuck. I'm kind of curious myself.*

> AGENT: So you're giving permission for us to open them?

> DEFENDANT: *Well, see I need to talk to my lawyer. 'Cause I don't know — I need to talk to my lawyer to know what to do.*

> AGENT: Like I said, what we talked about earlier. It's your choice whether you want an attorney or not. Here's the thing, okay — you've already told us these are not yours, that they're going to somebody else. That's fine. We know there is pseudo inside those.

> DEFENDANT: *[unintelligible] I mean, I don't fucking know.*

> AGENT: You got to tell us one way or another whether you want to talk to an attorney. I mean are you saying that — I mean, you gotta . . .

> DEFENDANT. *I mean I just don't want to end up fucking trying to, you know . . .*

> AGENT: Well, you're not under arrest right now anyways, 'cause like I said . . .

> DEFENDANT: *I know I'm not the one you're fucking looking for.*

---

[6](...continued)
approximately 50 minutes of additional recording. Both Agent Austin and Assistant Chief
Meyer testified, however, that they did not believe there was any significant conversation
— nor a significant lapse of time — which occurred between the two recordings.

AGENT:          Right, we know that.  We understand that.

DEFENDANT:      *And then I don't want to end up fucking myself because I tried to fucking help you guys out, you know what I mean?*

AGENT:          We already talked about that.

DEFENDANT:      *I know, but I don't fucking know that, man.  But I mean I know I was fucking stupid.  I should have let him send [unintelligible].  That was fucking dumb.  I mean [unintelligible].*

AGENT:          So, I mean you're not under arrest, okay?  So, like I said it's your choice whether you want to talk to an attorney or not.  That's strictly your choice.  If you want to give us a voluntary statement about what's going on here, that's fine.  If you don't want to you can stop us at any time, you can tell us you want to stop the interview and don't want to give a voluntary statement.  Alright, that's fine.  That's totally up to you.  I mean, you have information we're interested in.  You obviously can help us out tremendously.  You can open a lot of doors that have been closed for us for a long time.  We've been looking for someone to open doors for us.  And before we came here today, we decided that you were that guy that could do that, as long as you are okay with cooperating with us.  So, it's really up to you.  I can't tell you one way or another.  I can't give you advice.  I can't tell you, you know, you're a grown man.  You're 30 . . . you're 30, 31 years old.  So, if you want to give us a voluntary statement, you're more than welcome to give us a voluntary statement.  It's really up to you.  I mean, we want to be able to open up the pseudo, we want to make sure there's not a lab here.  That's what we want to do.

DEFENDANT:      *I know you're looking, go ahead and fucking . . . I mean I told you . . .*

8

| AGENT: | I mean I know it's a weird question that can I open the package. I know it's weird that I have to say can I open the package, but you know what — I have to ask you. I have to. I mean it would be rude for me to just go over and start . . . |
|---|---|
| DEFENDANT: | *[unintelligible]* |
| AGENT: | Okay, thank you. |

As shown above, when Agent Austin initially asked if it was "okay" to open up the packages, Defendant said "I don't give a fuck." Austin followed up by asking whether Defendant was "giving permission for us to open them," and Defendant responded by saying he needed to talk to his lawyer "to know what to do." Austin attempted to clarify the conflicting answers by first telling Defendant "[i]t's your choice whether you want an attorney or not," but indicating that "[y]ou got to tell us one way or another whether you want to talk to an attorney." Defendant again equivocates, and after being advised again by Austin that "it's really up to you," Defendant consents to a search of the packages.

The officers then opened the packages and found pills containing pseudoephedrine. During the balance of the conversation, Defendant makes various incriminating statements and assists officers in a search of the residence. At times, Defendant alerted officers as to the location of contraband. After the search was completed, officers left the scene. Defendant was not arrested that day.

## IV. DISCUSSION

In his first motion to suppress, Defendant asserts the search of his home on July 26, 2011, and the search of the packages, violated the Fourth Amendment. Defendant claims he did not consent to a search of the property or the packages, and alternatively, if consent was given, it was not voluntary. In his second motion to suppress, Defendant argues that he was interrogated by law enforcement after requesting to speak with an attorney, in violation of his Fifth and Sixth Amendment rights.

## A. Was the Search of Defendant's Residence Unlawful?

The Fourth Amendment to the United States Constitution protects persons and their property against unreasonable searches and seizures. Searches and seizures inside a home without a warrant are presumptively unreasonable. *Kentucky v. King*, _____ U.S. _____, 131 S. Ct. 1849, 1856 (2011) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). The warrant requirement is subject to certain exceptions, however, including consent to search given by the occupant. *United States v. Guzman*, 507 F.3d 681, 687 (8th Cir. 2007) ("While the Fourth Amendment requires the police to obtain a warrant before a search, consent is a valid exception to the warrant requirement."). The Government has the burden of proving by a preponderance of the evidence that the consent to search was knowing and voluntary. *United States v. Farnell*, 701 F.3d 256, 262-63 (8th Cir. 2012).

### 1. Did Defendant Give Consent to Search?

Here, Defendant first argues that he did not give consent to search his property. Defendant's assertion is contrary to the testimony given by Agent Austin, Inspector Marshall, and Assistant Chief Meyer at the instant hearing. Austin testified that after describing the investigation to Defendant and answering Defendant's questions, and after Defendant gave the matter significant thought, Austin told him that "you need to make a decision what you want to do." At that point, Defendant stated he wanted to cooperate. Austin asked Defendant "if everybody could come in and if we could search his residence," and Defendant said yes. Both Marshall and Meyer also testified that Defendant eventually granted consent to search the house. I believe the officers were credible in their testimony. Accordingly, as a factual matter, I find Defendant gave consent to search his property.

### 2. Was Defendant's Consent Voluntary?

A finding that consent was given does not, however, end the discussion. The Government bears the burden of proving the consent was voluntary. *United States v.*

*Quintero*, 648 F.3d 660, 667 (8th Cir. 2011). Consent to search is voluntary "if it was 'the product of an essentially free and unconstrained choice by its maker,' rather than 'the product of duress or coercion, express or implied.'" *United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990) (internal citations omitted). The Government has the burden of proving by a preponderance of the evidence that the consent was voluntary. *United States v. Saenz*, 474 F.3d 1132, 1137 (8th Cir. 2007).

To determine whether consent was voluntary, the Court must look at the totality of the circumstances, including both the characteristics of the consenting party and the environment surrounding the consent. *United States v. Arreola*, 250 Fed. Appx. 765, 767 (8th Cir. 2007). These factors include:

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*United States v. Golinveaux*, 611 F.3d 956, 959 (8th Cir. 2010) (quoting *United States v. Arciniega*, 569 F.3d 394, 398 (8th Cir. 2009)).

Turning to the facts in the instant action, the Court will first consider the "characteristics of the consenting party." The record is silent regarding Defendant's age and education. Defendant is clearly a young adult, however, and apparently has at least average intelligence. Defendant told officers that he had used methamphetamine on the

day before the search, but there is no indication that he was under the influence of a controlled substance when he gave consent to search the property. Agent Austin testified that Defendant was coherent, appeared to understand Austin's statements, and responded appropriately. A review of the recording taken during the interview inside the house does not show any evidence that Defendant was under the influence of a controlled substance at that time. Defendant was not given a *Miranda* warning, but apparently had knowledge of his right to speak with an attorney, as evidenced by his comments regarding an attorney during the discussion inside the house. Defendant presumably had some knowledge of "the protections that the legal system provides for suspected criminals," by virtue of his prior OWI conviction.

The Court next turns to "the environment surrounding the consent." Defendant's consent to search the house was given after discussing the matter outside with Agent Austin for approximately 40 minutes. According to Austin, Defendant had a lot of questions about the investigation, whether he was in trouble, what he could be charged with, whether he would be responsible for actions taken by others on his property to manufacture methamphetamine, and whether he was going to jail. By all accounts, Austin was "calm and collected" when talking with Defendant outside the residence, and did not raise his voice at any time. While there were numerous officers on the scene, only Austin, Inspector Marshall, and Assistant Chief Meyer had direct contact with Defendant outside the house. The remaining officers were standing under shade trees or waiting inside their cars, trying to stay cool. All but one of the officers were in plain clothes and did not display their weapons.[7] Officers did not use any threats or physical intimidation to obtain Defendant's consent, nor is there any evidence officers made promises or

_____

[7] Agent Austin testified that when he conducted a protective sweep of the house, he drew his weapon in entering the house. It is unknown whether Defendant observed Austin draw his weapon.

misrepresentations. Defendant was not in custody or under arrest when consent was given. In fact, Defendant roamed around his yard and smoked a cigarette before deciding to give consent. He was free to leave at any time, or require the officers to leave. After consent was given to search, Defendant and the officers entered the house, where Defendant assisted in the search.

After considering all of these facts, including Defendant's characteristics and the circumstances surrounding the consent, I believe the Government has proved the consent was voluntary. The encounter took place in mid-afternoon in Defendant's yard. *Quintero*, 648 F.3d at 668 ("the time of day during which a search takes place is relevant in the analysis"). The discussion with Agent Austin leading up to Defendant's consent was "conversational." *Id*. at 666-67 (the "cooperative tone of the conversation between the officer and the defendant" is relevant to the analysis). The atmosphere was not "police dominated." Defendant dealt primarily with Austin and was permitted to walk around the yard and smoke a cigarette while deciding whether to consent to a search of his property. *Compare, Golinveaux*, 611 F.3d. at 958 (consent determined to be voluntary after 50-year-old woman was held in a 12-foot by 20-foot unmarked windowless room containing six or seven other people and questioned for 38 minutes). *See also, Arreola*, 250 Fed. Appx. at 768 ("The mere presence of multiple officers and weapons does not compel a finding that consent is involuntary."). While Defendant was not Mirandized at any time that day, Austin advised him that the officers would leave (and obtain a search warrant) if Defendant asked them to do so. *Saenz*, 474 F.3d at 1132 (lack of a Miranda warning does not make an otherwise voluntary consent involuntary). Defendant's later cooperation in the search also suggests his earlier consent was voluntary. *Chaidez*, 906 F.2d at 382.

In determining whether consent was given voluntarily, the Court should not apply the factors "mechanically." *Id*. at 381. Instead, the Court must look at all of the circumstances and determine whether consent was "the product of an essentially free and

unconstrained choice by its maker" or "the product of duress and coercion, express or implied." *Id.* at 380. For the reasons set for above, I believe Defendant had "a reasonable appreciation of the nature and significance of his actions," *Saenz*, 474 F.3d at 1136, and the Government has proved by a preponderance of the evidence that Defendant's consent to search his property was voluntary.

## B. Was the Search of the Packages Unlawful?

Defendant also claims the warrantless search of the three packages delivered that day was unconstitutional. His argument is apparently the same – that he did not give consent, and if he did, it was not given voluntarily.

After the officers entered the house to conduct the search, Defendant sat down at the kitchen table with Agent Austin and Assistant Chief Meyer. Fairly early in the conversation, Austin asked Defendant if it was "okay" to open the packages and look at what's inside them. Defendant initially agreed, saying "I don't give a fuck. I'm kind of curious myself." When Austin followed up by specifically asking for "permission" to open the packages, however, Defendant said "I need to talk to my lawyer to know what to do." Austin then engaged Defendant in further discussion to resolve his inconsistent responses. Eventually, Defendant consented to a search of the packages. (Although in listening to the recording, I was unable to determine Defendant's exact words.)

An analysis of whether the consent was voluntary closely follows that set forth above. The conversation between Agent Austin and Defendant took place in Defendant's kitchen. Defendant was not under arrest. Austin and Assistant Chief Meyer were apparently the only officers nearby. The recording reflects Austin did not raise his voice or threaten Defendant in any way. Defendant initially consented to a search of the packages without hesitation. When asked a second time for "permission," Defendant did not respond directly, but instead referred to talking to a lawyer. Given these inconsistent responses, Austin's focus shifted to Defendant's comments regarding a lawyer. Defendant

then equivocated regarding "what to do." Austin repeatedly told Defendant that whether he wanted to talk to an attorney was "strictly your choice," he could "stop at any time," it was "totally up to you," and that Austin "can't tell you one way or another." Defendant then said "go ahead" and consented to the search.

The Court notes parenthetically that even *if* Defendant made a valid request to speak with an attorney – an issue which will be discussed below – that does not preclude a finding that his consent to search was voluntary. A consent to search is not a self-incriminating statement and, therefore, the Fifth Amendment does not apply to the validity of the search. *Cody v. Solem*, 755 F.2d 1323, 1330 (8th Cir. 1985) ("Simply put, a consent to search is not an incriminating statement."). That is, a violation – if any – of a suspect's Fifth Amendment rights is only one factor in considering the voluntariness of his consent to search. *Id.* In other words, a suspect may give voluntary consent to search even after questioning must stop due to his request to speak with an attorney. *United States v. Knight*, 58 F.3d 393, 397 (8th Cir. 1995) ("[T]he Fifth Amendment's protection against self-incriminating statements may limit further interrogation once a person in custody invokes his right to counsel, but there is no similar prohibition on securing a voluntary consent to search for physical evidence.").

After considering all of the surrounding circumstances, I believe Defendant's consent to search the packages was voluntary. After Defendant gave inconsistent responses to Agent Austin's request to search the packages, Austin engaged in additional conversation to resolve the discrepancy. Austin repeatedly told Defendant that it was entirely his choice on how to proceed. Defendant then consented. I believe the decision to consent was given freely by Defendant, with a "reasonable appreciation" of his actions, and was not the product of duress or coercion. *Saenz, 474 F.3d at 1136; Chaidez*, 906 F.2d at 380.

## C. Was Defendant Improperly Interrogated After Asking for Counsel?

In his second motion to suppress, Defendant argues that questioning by the officers should have ended when he asked to speak with an attorney, and that statements made by him after that time must be suppressed. According to Defendant, the continued questioning violated the Fifth and Sixth Amendments.

Preliminarily, the Court notes that the Sixth Amendment right to counsel "does not attach until a prosecution is commenced." *Rothgery v. Gillespie County, Tex.*, 554 U.S. 191 (2008) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). See also *United States v. Morriss*, 531 F.3d 591, 592 (8th Cir. 2008) (concluding the Sixth Amendment right to counsel had not attached when the defendant was interviewed by an FBI agent). Defendant was not arrested or charged before or after the interview with Agent Austin, and I believe the Sixth Amendment has no application here.

Turning to Defendant's Fifth Amendment claim, it has been hornbook law since *Miranda v. Arizona*, 384 U.S. 436 (1966), that if a defendant "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Id.* at 444-45. Furthermore, "[t]he mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." *Id.* at 445. The right to counsel established in *Miranda* was intended "to insure that the right against compulsory self-incrimination was protected." *Davis v. United States*, 512 U.S. 452, 457 (1994) (quoting *Michigan v. Tucker*, 417 U.S. 433, 443-44 (1974)). *See also, Edwards v. Arizona*, 451 U.S. 477 (1981).

Defendant's Fifth Amendment claim is dependent on a finding that he was in custody when he asked to speak with an attorney. That is, the protections afforded by *Miranda* apply only to *custodial* interrogations. *United States v. Kelly*, 329 F.3d 624, 630

(8th Cir. 2003) ("Because Kelly was not subject to custodial interrogation on December 3, he was not entitled to the protections of *Miranda*."). Accordingly, even *if* Defendant made a valid request to speak with an attorney before questioning continued, the officers were not required to cease their questioning if the interrogation took place in a noncustodial setting. *Burket v. Angelone*, 208 F.3d 172, 197 (4th Cir. 2000) (a suspect subject to interrogation while not in custody can not invoke the protections provided by *Miranda*); *United States v. Wyatt*, 179 F.3d 532, 537 (7th Cir. 1999) ("The Fifth Amendment right to counsel safeguarded by *Miranda* cannot be invoked when a suspect is not in custody, even if in anticipation of future custodial interrogation."); *Tukes v. Dugger*, 911 F.2d 508, 515 (11th Cir. 1990) ("Where the prisoner is not in custody, the *Edward's* and *Roberson* concerns are not triggered because the non-custodial defendant is free to refuse to answer police questions, free to leave the police station and go home, and free to seek out and consult a lawyer."); *United States v. Sharma*, 2009 WL 152868 at *11 (M.D. Fla.) (The Fifth Amendment protection against self-incrimination "encompasses a right to the assistance of counsel only *during custodial interrogation*.") (italics in original); *Caldwell v. Warren*, 2011 WL 379406 at *7 (E.D. Mich.) (collecting cases).

The Government argues Defendant's motion fails for two reasons: first, he was not in custody when being questioned in his kitchen; and second, he did not clearly and unambiguously ask to speak to an attorney before questioning could continue. Accordingly, I will first address the issue of whether Defendant was in custody during the questioning by Agent Austin, and I will then address the issue of whether he unambiguously requested counsel.

### 1. Was Defendant in Custody While Being Questioned?

To determine whether a defendant is in custody for *Miranda* purposes, courts look to "the totality of circumstances confronting the defendant at the time of the interview, and ask[ ] 'whether a reasonable person in his position would consider his freedom of

movement restricted to the degree associated with formal arrest.'" *United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012) (quoting *United States v. Flores-Sandoval*, 474 F.3d 1142, 1146 (8th Cir. 2007)). In determining whether a defendant is in custody, the Eighth Circuit Court of Appeals had identified six non-exclusive factors for courts to consider:

> (1) whether the suspect was informed that he was free to leave and that answering was voluntary; (2) whether the suspect possessed freedom of movement; (3) whether the suspect initiated contact or voluntarily acquiesced; (4) whether strong arm tactics or strategies were employed; (5) whether the atmosphere was police dominated; or, (6) whether the suspect was placed under arrest at the end of the questioning.

*Flores-Sandoval*, 474 F.3d at 1146-47 (citing *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)). In considering these factors, "[t]he first three indicia are mitigating factors, which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors, which, if present, aggravate the existence of custody." *United States v. Axsom*, 289 F.3d 496, 500-01 (8th Cir. 2002). The inquiry is an objective one. In other words, "the 'subjective views harbored by either the interrogating officers or the person being questioned' are irrelevant." *J.D.B. v. North Carolina*, ___ U.S. ___, 131 S. Ct. 2394, 2402 (2011) (quoting *Stansbury v. California*, 511 U.S. 318, 323 (1994)).

Here, the interview took place in Defendant's kitchen. While Defendant did not initiate the contact with police that day, he eventually consented to a search of his property and acquiesced to questioning. He was told repeatedly that he was not required to cooperate with authorities and could ask them to leave at any time. Defendant was not handcuffed and his freedom of movement was not restricted in any way. Defendant walked around the yard smoking a cigarette and, after entering the house, accompanied officers during parts of their search. While there were several officers on the scene, I do

not believe it was "police dominated." Defendant dealt primarily with Agent Austin and Assistant Chief Meyer. The officers did not raise their voices, use "strong arm tactics," or otherwise physically intimidate Defendant while asking questions. Defendant was told before questioning began that it was not the officers' intent to arrest Defendant that day and he was not, in fact, arrested at the conclusion of the questioning.

I do not believe that a reasonable person in Defendant's position would have considered his "freedom of movement restricted to the degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *Flores-Sandoval*, 474 F.3d at 1146. *See United States v. Johnson*, 619 F.3d 910 (8th Cir. 2010) (suspect questioned in his house was not in custody). Accordingly, Defendant was not in custody during the questioning in his kitchen, a Miranda warning was not required, and the officers were not required to discontinue questioning, even after Defendant referred to meeting with an attorney.

### 2. *Did Defendant Unambiguously Ask for Counsel Before Questioning Could Continue?*

As set forth above, I believe Defendant was not in custody when being questioned, and therefore cannot invoke the protections of *Miranda*. Nonetheless, in case the district court disagrees with my conclusion in that regard, I will address the second question of whether Defendant unambiguously requested counsel before questioning could continue.

Agent Austin asked Defendant for permission to open the packages, and Defendant responded by saying "I need to talk to my lawyer" and "I need to talk to my lawyer to know what to do." Defendant asserts that following those statements, all questioning must cease. The Government argues that Defendant's request for counsel here was ambiguous. The *Davis* court made it clear that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our

precedents do not require the cessation of questioning." 512 U.S. at 459 (italics in original).

> Rather, the suspect must unambiguously request counsel. As we have observed, "a statement either is such an assertion of the right to counsel or it is not." Although a suspect need not "speak with the discrimination of an Oxford don," he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.

*Id.* at 459 (internal citations omitted). *See also, United States v. Havlik,* 710 F.3d 818, 821 (8th Cir. 2013) (a request for counsel must be clear and unambiguous).

Here, Defendant first mentioned speaking with an attorney in response to Agent Austin's request for permission to open the packages. Defendant told Austin that he needed to talk to his lawyer "to know what to do." This response contradicted Defendant's initial answer to Austin's question of whether it was "okay" to open the packages, when Defendant said "I don't give a fuck. I'm kind of curious myself." As discussed in more detail above, after further discussion regarding the inconsistent responses, Defendant gave Austin permission to open the packages.

In other words, Defendant's reference to an attorney was in the context of knowing "what to do" about giving consent to open the packages. Defendant's comments in this regard were ambiguous, however, because immediately prior to that Defendant said it was okay to open the packages. I believe a reasonable officer could view Defendant's responses as inconsistent or ambiguous, and would be authorized to ask additional questions to address the ambiguity. Defendant subsequently consented to a search of the packages. In any event, at no time did Defendant ever advise the officers that he wanted to speak with an attorney before answering any additional questions.

In summary, because Defendant did not unambiguously tell the officers that he wanted to speak with an attorney before answering any further questions, further questioning by the officers was not violative of the Fifth Amendment. Accordingly, even *if* Defendant was in custody while being questioned, I believe Defendant's second motion to suppress should be denied.

## V. RECOMMENDATION

For the reasons set forth above, I respectfully **RECOMMEND** the Motion to Suppress: Search of Home/Property (docket number 12) and the Motion to Suppress: Statements to Police (docket number 13) filed by Defendant be **DENIED**.

The parties are advised, pursuant to 28 U.S.C. 636(b)(1), that within fourteen (14) days after being served with a copy of this Report and Recommendation, any party may serve and file written objections with the district court. *The parties are reminded that pursuant to Local Rule 72.1, "[a] party asserting such objections must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections." Accordingly, if the parties are going to object to the Report and Recommendation, they must promptly order a transcript of the hearing held on February 4, 2014.*

DATED this 24ᵗʰ day of February, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA