**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

BENJAMIN CONRAD,

    Defendant.

No. 13-CR-2039-LRR

**ORDER**

_____

**TABLE OF CONTENTS**

*I.   INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1*

*II.  RELEVANT PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . 2*

*III. STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2*

*IV.  RELEVANT FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . 3*

*V.   ANALYSIS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4*

    *A.   Seizure of Packages. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5*
    *B.   Consent to Search Defendant's Home. . . . . . . . . . . . . . . . . . . 6*
    *C.   Consent to Search Packages. . . . . . . . . . . . . . . . . . . . . . . . 8*
    *D.   Alleged* **Miranda** *Violation. . . . . . . . . . . . . . . . . . . . . . . . . 9*

*VI.  CONCLUSION.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12*

## *I.   INTRODUCTION*

    The matter before the court is Defendant Benjamin Conrad's Objections ("Objections") (docket no. 23) to United States Magistrate Judge Jon S. Scoles's Report and Recommendation (docket no. 19), which recommends that the court deny Defendant's "Motion to Suppress: Search of Home/Property" (docket no. 12) and "Motion to Suppress: Statements to Police" (docket no. 13) (collectively, "Motions").

## II.  RELEVANT PROCEDURAL HISTORY

On December 18, 2013, a grand jury returned an Indictment (docket no. 2) that charged Defendant with: (1) conspiring to import pseudoephedrine into the United States from Canada while intending, knowing or having reasonable cause to believe that the pseudoephedrine would be used to manufacture methamphetamine in violation of 21 U.S.C. §§ 963, 952 and 960; and (2) possessing a mixture or substance containing a detectable amount of pseudoephedrine knowing or having reasonable cause to believe that it would be used to manufacture a controlled substance in violation of 21 U.S.C. § 841(c)(2). On January 16 and January 17, 2014, Defendant filed the Motions. On January 27, 2014, the government filed a Resistance to the Motions (docket no. 15). On February 4, 2014, Judge Scoles held a hearing on the Motions. *See* February 4, 2014 Minute Entry (docket no. 17). Defendant appeared in court with his attorney, Mark Brown. Special Assistant United States Attorney Lisa Williams represented the government. On February 24, 2014, Judge Scoles issued his Report and Recommendation. On March 5, 2014, Defendant filed his Objections. The Objections and Report and Recommendation are fully submitted and ready for decision.

## III.  STANDARD OF REVIEW

When a party files a timely objection to a magistrate judge's report and recommendation, a "judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge must consider de novo any objection to the magistrate judge's recommendation."); *United States v. Lothridge*, 324 F.3d 599, 600 (8th Cir. 2003) (noting that a district judge must "undertake[] a de novo review of the disputed portions of a magistrate judge's report and recommendations"). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the

magistrate judge." 28 U.S.C. § 636(b)(1); *see also* Fed. R. Crim. P. 59(b)(3) ("The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."). It is reversible error for a district court to fail to engage in a de novo review of a magistrate judge's report when such review is required. *Lothridge*, 324 F.3d at 600. Accordingly, the court reviews the disputed portions of the Report and Recommendation de novo.

## IV. RELEVANT FACTUAL BACKGROUND[1]

On July 26, 2011, United States Postal Inspector Kevin Marshall, after receiving a tip of suspicious packages from the postmaster in Winthrop, Iowa, took possession of three packages addressed to Defendant. At approximately 2:30 p.m., Marshall, along with Special Agents John "Jake" Austin and Josh Mulnix of the Iowa Division of Narcotics Enforcement and several other local law enforcement officials, performed a controlled delivery of the packages, and Defendant accepted the packages. Austin then identified himself as an agent with the Division of Narcotics Enforcement. Austin asked Defendant whether there was anything in the house that could hurt law enforcement, and Defendant stated that the house contained a handgun. Austin then entered the house and conducted a protective sweep.

Upon exiting the house, Austin reintroduced himself and Independence, Iowa Assistant Police Chief Darwin Meyer to Defendant. Defendant asked Austin and Meyer whether he was going to jail, and Austin assured Defendant that he was not under arrest and that Austin was not going to take Defendant to jail. Austin repeatedly asked Defendant if he could search the property and that Defendant had the option of not speaking with him.

---

[1] After reviewing the hearing transcript, the court finds that Judge Scoles accurately and thoroughly set forth the relevant facts in the Report and Recommendation. *See* Report and Recommendation at 2-9. Accordingly, the court only briefly summarizes the facts. When relevant, the court relies on and discusses additional facts in conjunction with its analysis of the law.

3

Defendant consented to a search of his property, and Defendant and the officers then entered Defendant's house. Approximately fifty minutes elapsed from the time Inspector Marshall approached the house to the time the officers entered the house.

Once inside, Austin and Assistant Chief Meyer questioned Defendant. During this conversation, Austin asked whether it was okay if he opened the packages, and Defendant replied "I don't give a fuck." Austin then sought to clarify that Defendant was giving permission to search the packages, and Defendant stated that he "didn't know" and wanted to talk to his lawyer. After further questioning, Defendant consented to a search of the packages. The officers opened the packages and discovered pills containing pseudoephedrine.

## V. ANALYSIS

Defendant first argues that the government unlawfully seized the packages addressed to Defendant when Inspector Marshall arrived at the post office.[2] Defendant also objects to Judge Scoles's conclusions that: (1) Defendant voluntarily consented to a search of his home; (2) Defendant voluntarily consented to a search of the packages; and (3) law enforcement properly interrogated Defendant.

---

[2] Defendant made this argument in his original Motion to Suppress: Search of Home/Property. *See* Brief in Support of Motion to Suppress Search (docket no. 12-1) at 10. The parties appeared to continue to contest this issue at the suppression hearing. *See* Transcript of Motion to Suppress Hearing ("Transcript") (docket no. 21) at 30. While Judge Scoles did not specifically address whether the packages were unlawfully seized, in his Objections, Defendant appears to continue to contend that the packages were unlawfully seized. *See* Objections at 1. Accordingly, the court will address this argument de novo.

## A. *Seizure of Packages*

Defendant appears to contend that the government illegally seized the packages while they were still at the post office.[3] Defendant argues that because the packages were taken out of the normal chain of delivery, the government meaningfully interfered with Defendant's possessory interest in the packages.

"The Fourth Amendment protects against both unreasonable searches and unreasonable seizures." *United States v. Va Lerie*, 424 F.3d 694, 701 (8th Cir. 2005) (en banc). "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in the property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). "By requiring some *meaningful interference* with an individual's possessory interests in property, the Supreme Court inevitably contemplated excluding *inconsequential interference* with an individual's possessory interests." *Va Lerie*, 424 F.3d at 706. In the context of package delivery, if the government's detention of a package results in an untimely delivery, the package has been seized for Fourth Amendment purposes. *See United States v. Zacher*, 465 F.3d 336, 338 (8th Cir. 2006).

Here, three of the packages at issue arrived at the post office on July 25, 2011, and the fourth package arrived on July 26, 2011. Inspector Marshall testified that by the time the packages arrived on July 25, 2011, the carrier had left for the day and thus the earliest date the packages could have been delivered to Defendant was July 26, 2011. *See* Transcript at 5, 11. Law enforcement actually conducted the controlled delivery on July 26, 2011. Moreover, the record reflects that Defendant had no expectation of when the

---

[3] In his Motion to Suppress: Search of Home/Property, Defendant argues that "it was legally inappropriate for the postal service to inspect, examine or look into the package in question without a valid search warrant." Motion to Suppress: Search of Home/Property at 9. However, in his Objections, he states that the "packages were taken out of the 'normal[]' chain of delivery and held by the post office, in violation of . . . [D]efendant's rights." Objections at 4. Thus, it appears to the court that Defendant is arguing that the government unlawfully seized the packages.

5

packages were to be delivered. Therefore, there was no meaningful interference with Defendant's possessory rights in the packages because the packages were timely delivered. Accordingly, law enforcement did not violate Defendant's Fourth Amendment rights because they did not seize the packages at the post office.

## B. Consent to Search Defendant's Home

Defendant next objects to Judge Scoles's conclusion that Defendant voluntarily gave law enforcement consent to search his home.[4] Objections at 4. A court determines the voluntariness of a person's consent by assessing "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *see also United States v. Smith*, 260 F.3d 922, 924 (8th Cir. 2001) (discussing the individual characteristics and environmental factors relevant to a court's determination of the voluntariness of a person's consent); *United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990) (same). "The government bears the burden to prove by a preponderance of the evidence that consent to search was freely given . . . ." *Smith*, 260 F.3d at 924.

The voluntariness of a defendant's consent is examined based on the totality of the circumstances, and courts look to the following, non-exhaustive list of relevant factors:

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or

---

[4] Defendant does not appear to argue that he did not consent to the search of his home. Rather, he appears to only argue that such consent was not voluntary.

6

> misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*United States v. Quintero*, 648 F.3d 660, 667 (8th Cir. 2011) (quoting *United States v. Golinveaux*, 611 F.3d 956, 959 (8th Cir. 2010)). Thus, relevant factors include the personal characteristics of Defendant and the environment surrounding Defendant's consent. *United States v. Cisneros-Gutierrez*, 598 F.3d 997, 1003 (8th Cir. 2010) ("In determining voluntariness, the personal characteristics of the individual who supposedly consented and the environment in which the consent allegedly occurred are relevant.")

Turning first to Defendant's personal characteristics, Defendant argues that he "was not well experienced with law enforcement or the criminal justice system, . . . used narcotics a day or two before contact with law enforcement . . . [and] was not read his *Miranda* [r]ights." Objections at 5 (emphasis added). Regarding the environment in which the consent took place, Defendant argues that his consent was not voluntary because of "[t]he number of agents at the defendant's residence and the length they were present . . . and [the] [l]ack of any signed consent to search form." *Id*.

The court agrees with Judge Scoles that "[a]fter considering all of these facts, including Defendant's characteristics and the circumstances surrounding the consent, . . . the [g]overnment has proved the consent was voluntary." Report and Recommendation at 13. Defendant does not adduce any additional facts or arguments to support a contrary finding. Thus, for the reasons more fully set forth in the Report and Recommendation, the court finds that Defendant's consent to the search of his home was voluntary.

## C. Consent to Search Packages

Defendant next argues that he did not voluntarily consent to the search of the packages.[5] Objections at 3. In support of this argument, Defendant contends that "the number of agent[]s present upon his property and in his home; the . . . protective sweep of [D]efendant's home[;] . . . the length of time law enforcement was at his residence[;] and the fact that [D]efendant was verbalizing his desire to seek legal advice" rendered his consent involuntary. *Id.*

Judge Scoles summarized the interaction as follows:

> After the officers entered the house to conduct the search, Defendant sat down at the kitchen table with Agent Austin and Assistant Chief Meyer. Fairly early in the conversation, Austin asked Defendant if it was "okay" to open the packages and look at what's inside them. Defendant initially agreed, saying "I don't give a fuck. I'm kind of curious myself." When Austin followed up by specifically asking for "permission" to open the packages, however, Defendant said "I need to talk to my lawyer to know what to do." Austin then engaged Defendant in further discussion to resolve his inconsistent responses. Eventually, Defendant consented to a search of the packages. (Although in listening to the recording, I was unable to determine Defendant's exact words.)
>
> . . . The conversation between Agent Austin and Defendant took place in Defendant's kitchen. Defendant was not under arrest. Austin and Assistant Chief Meyer were apparently the only officers nearby. The recording reflects Austin did not raise his voice or threaten Defendant in any way. Defendant initially consented to a search of the packages without

---

[5] Defendant argues that the record is unclear about whether Defendant verbalized his consent. However, Agent Austin's uncontradicted testimony was that Defendant said "You may open those packages." Transcript at 18. Moreover, upon review of the recording of the conversation, although the audio of Defendant's consent is not clear, the context surrounding Defendant's verbalization comports with Agent Austin's testimony.

8

> hesitation. When asked a second time for "permission," Defendant did not respond directly, but instead referred to talking to a lawyer. Given these inconsistent responses, Austin's focus shifted to Defendant's comments regarding a lawyer. Defendant then equivocated regarding "what to do." Austin repeatedly told Defendant that whether he wanted to talk to an attorney was "strictly your choice," he could "stop at any time," it was "totally up to you," and that Austin "can't tell you one way or another." Defendant then said "go ahead" and consented to the search.

Report and Recommendation at 14-15. The court has reviewed the hearing transcript and the audio of the conversation[6] and finds that Judge Scoles correctly found that Defendant voluntarily consented to the search of the packages.

### D. Alleged *Miranda* Violation

Finally, Defendant objects to Judge Scoles's conclusion that Defendant was not improperly interrogated pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), when officers continued asking him questions after he stated that he needed to speak to an attorney.[7] In support of his argument, Defendant contends that Judge Scoles erred in finding that Defendant was in custody. If Defendant was subjected to a custodial interrogation without first being informed of his *Miranda* rights, the statements that he made must be suppressed.

Initially, the court notes that whether officers violated Defendant's Fifth Amendment rights pursuant to *Miranda* hinges only on whether Defendant was in custody.

---

[6] *See* Conrad Interview CD (docket no. 15-2)

[7] To the extent that Defendant argues that he had a Sixth Amendment right to counsel during this interview, the court disagrees. The Sixth Amendment right to counsel "does not attach until a prosecution is commenced." *Rothgery v. Gillespie County, Tex.*, 554 U.S. 191 (2008) (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)) (internal quotation marks omitted). Here, the government had not initiated a prosecution at the time of the interview. Accordingly, Defendant's Sixth Amendment right to counsel had not attached.

The parties agree that the officers never gave Defendant *Miranda* warnings. Accordingly, if Defendant was in custody, then all of his statements that were a product of custodial interrogation must be suppressed, regardless of whether he specifically invoked his right to counsel. *See Davis v. United States*, 512 U.S. 452, 457 (1994) ("[A] suspect subject to custodial interrogation has the right to consult with an attorney and to have counsel present during questioning, and . . . the police must explain this right to him before questioning begins."); *Oregon v. Elstad*, 470 U.S. 298, 307 (1985) ("[U]nwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*."). Alternatively, if Defendant was not in custody, then the protections of *Miranda* do not apply, Defendant cannot invoke a right to counsel that does not exist and none of Defendant's statements must be suppressed. *United States v. Kelly*, 329 F.3d 624, 630 (8th Cir. 2003) (stating that a defendant who "was not subject to custodial interrogation . . . was not entitled to the protections of *Miranda*"). The protections provided under *Miranda* guarantee a suspect the right to have an attorney present during a custodial interrogation as a prophylactic measure to ensure that the suspect's testimony was not compelled. When the suspect is not in custody, there is no such concern, and the suspect has no right to an attorney, even if the suspect requests an attorney. *See, e.g., Burket v. Angelone*, 208 F.3d 172, 197 (4th Cir. 2000); *United States v. Wyatt*, 179 F.3d 532, 537 (7th Cir. 1999); *Tukes v. Dugger*, 911 F.2d 508, 515 (11th Cir. 1990).

Whether a defendant is in custody for *Miranda* purposes is an objective inquiry, and courts "look[] to the totality of the circumstances confronting the defendant at the time of the interview, and ask[] 'whether a reasonable person in his position would consider his freedom of movement restricted to the degree associated with formal arrest.'" *United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012) (quoting *United States v. Flores-*

*Sandoval*, 474 F.3d 1142, 1146 (8th Cir. 2007)). The court looks to the following non-exclusive factors in determining whether a defendant is in custody:

> (1) whether the suspect was informed that he was free to leave and that answering was voluntary;
>
> (2) whether the suspect possessed freedom of movement;
>
> (3) whether the suspect initiated contact or voluntarily acquiesced;
>
> (4) whether strong arm tactics or strategies were employed;
>
> (5) whether the atmosphere was police dominated; or
>
> (6) whether the suspect was placed under arrest at the end of questioning.

*Id.* (quoting *United States v. Muhlenbruch*, 634 F.3d 987, 996 (8th Cir. 2011)).

Here, the court agrees with Judge Scoles that Defendant was not in custody. Judge Scoles accurately summarized the interview as follows:

> Here, the interview took place in Defendant's kitchen. While Defendant did not initiate the contact with police that day, he eventually consented to a search of his property and acquiesced to questioning. He was told repeatedly that he was not required to cooperate with authorities and could ask them to leave at any time. Defendant was not handcuffed and his freedom of movement was not restricted in any way. Defendant walked around the yard smoking a cigarette and, after entering the house, accompanied officers during parts of their search. While there were several officers on the scene, I do not believe it was "police dominated." Defendant dealt primarily with Agent Austin and Assistant Chief Meyer. The officers did not raise their voices, use "strong arm tactics," or otherwise physically intimidate Defendant while asking questions. Defendant was told before questioning began that it was not the officers' intent to arrest Defendant that day and

>he was not, in fact, arrested at the conclusion of the questioning.

Report and Recommendation at 18-19. Based on these circumstances, a reasonable person would not have considered his or her "freedom of movement restricted to the degree associated with formal arrest." *Huether*, 673 F.3d at 794. Accordingly, Defendant was not in custody for *Miranda* purposes. Because Defendant was not in custody, officers were not required to give Defendant *Miranda* warnings, and the officers were not required to cease questioning after Defendant mentioned a desire to speak to an attorney. Therefore, none of Defendant's statements must be suppressed.[8]

## VI. CONCLUSION

In light of the foregoing, the court **ORDERS**:

(1) The Objections (docket no. 23) are **OVERRULED**;

(2) The Report and Recommendation (docket no. 19) is **ADOPTED**; and

(3) The Motions (docket nos. 12 through 13 ) are **DENIED**.

---

[8] Even if Defendant was in custody and given his *Miranda* warnings, he would not have adequately invoked his right to counsel. *See Davis v. United States*, 512 U.S. 452, 459 (1994) ("[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning."). Defendant first indicated a willingness to talk, but then at one point mentioned that he needed to talk to his lawyer. Agent Austin reiterated that Defendant could choose not to speak with the officers, and Defendant then gave Austin permission to search the packages. The court concludes that a reasonable officer could view Defendant's statements as an ambiguous request for counsel. While the officers were not required to, they went to great lengths to clarify the ambiguity, and Defendant did not reiterate his desire to have an attorney present.

**DATED** this 21st day of March, 2014.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA